UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| v. | ) | 1:09CR218-1 |
| | ) | |
| | ) | |
| RYAN PAL CAUTHEN | ) | |

**MEMORANDUM OPINION AND ORDER**

THOMAS D. SCHROEDER, District Judge

Before the court is the motion of Defendant Ryan Pal Cauthen ("Cauthen") to suppress two handguns, cocaine base ("crack"), and money seized from the inventory search of his moped[1] parked outside a hotel room where he was arrested. (Doc. 10.) The motion has been fully briefed, and the court held a hearing on October 8, 2009. For the reasons set forth below, the motion is denied.

**I. BACKGROUND**

The Government presented the testimony at the October 8, 2009, suppression hearing of Salisbury (North Carolina) Police Department officers Joseph Miller ("Miller") and Wilbert Brown

---

[1] A moped is defined as "[a] vehicle that has two or three wheels, no external shifting device, and a motor that does not exceed 50 cubic centimeters piston displacement and cannot propel the vehicle at a speed greater than 30 miles per hour on a level surface." N.C. Gen. Stat. § 105-164.3(22). Mopeds are expressly excluded from the definition of a "motor vehicle" under North Carolina law. N.C. Gen. Stat. § 20-4.01(23) (defining mopeds as defined in N.C. Gen. Stat. § 20-4.01(27)d1).

("Brown"), nine- and five-year veterans, respectively. The court finds their testimony credible and finds the following facts.

On July 9, 2008, Miller was called to investigate a disturbance in Room 211 of the Ramada, Ltd. motel (now known as the Travelodge), in Salisbury, North Carolina. Upon arriving, Miller met with the manager, who directed him to Room 211. There Miller met Brown, who arrived separately with other officers, and observed that the front window glass of Room 211 was broken. Three individuals were inside, including Cauthen. Officers smelled burning marijuana, and a marijuana "roach" cigarette was observed in the trash can just inside the door to the room.

The three occupants were either invited or directed out of the room, and officers questioned each in the parking lot whether they had anything "they shouldn't have." The female admitted she possessed a crack cocaine rock and crack pipe in her purse, and was arrested. Cauthen responded that he had some crack cocaine rocks in his pocket. The officers frisked him and, upon finding the drugs in his front pocket, arrested and handcuffed him. The third individual identified his car parked outside the hotel room and was asked for permission to search it. Upon obtaining permission, the officers discovered cocaine in the vehicle and arrested him.

2

Just outside the door to Room 211 was a moped leaning against the stairwell. It was not secured in any way.[2] One of the officers, Patrick Schmeltzer ("Schmeltzer"),[3] asked Cauthen whether it was his, and Cauthen indicated that it was. Schmeltzer decided to call a towing service because, as Miller explained, once Cauthen was arrested "[t]here was nowhere else to leave the moped. There was nobody there, a third party, that we could release it to; and we have a lot of stolen mopeds. So we didn't feel comfortable leaving it with the owner not being present." Not only was the moped not secured, there was no way to secure it, in Miller's view. Brown testified that "after [Cauthen] was placed under arrest, there was nobody to go to because all three – everybody was arrested. So we had to tow it." Brown testified that the inventory of the moped was conducted to "protect the defendant, the department, [and] the tow company" against claims of loss. There is no evidence that Cauthen consented to the seizure of his moped.

Officers Miller and Brown both testified that the moped was towed and inventoried pursuant to the terms of the written Salisbury Police Department Operational Policy 411 ("Policy

---

[2] There was no showing that the moped or any compartment was locked.

[3] Schmeltzer was unavailable for the suppression hearing because he was on active duty at the time with the U.S. military serving in Iraq.

411") for vehicle towing and impoundment (Government Ex. 1), which provides, in part:

> Vehicles under the control of a person arrested are to be inventoried and towed at the direction of the arresting officer, unless:
>
> a. release of the vehicle <u>will not</u> hinder an arrest or investigation; and
>
> b. the vehicle can be claimed at the scene by the lawful owner; or
>
> c. the vehicle can be released to a responsible third party who is approved by both the officer and arrestee.

(Government Ex. 1 § V(A)(6) (emphasis in original).) Officer Schmeltzer inventoried the moped "right before the tow truck got there." Miller observed the process and took photographs. The inventory revealed a black bag that contained cocaine, two bags of marijuana, two handguns, and a "large amount of money." These items were seized and kept in the custody of the Salisbury Police Department. Cauthen was taken to the police station, where he was advised of his <u>Miranda</u> rights and interviewed.

Cauthen moves to suppress his statement to officers that the moped was his on the ground that he was in custody at the time but not advised of his <u>Miranda</u> rights. He also moves to suppress the drugs, guns, and money found in the moped on the

4

ground that the seizure of the moped violated the Fourth Amendment.[4]

**II. ANALYSIS**

   **A.   Suppression of Cauthen's Statement**

Cauthen first argues that his statement of ownership of the moped should be suppressed because it was the product of questioning while in custody, in violation of his rights under Miranda v. Arizona, 384 U.S. 436 (1966). He further argues that, once the statement is suppressed, the drugs, firearms and money should be suppressed as "fruits of the poisonous tree." Wong Sun v. United States, 371 U.S. 471 (1963).

Assuming without deciding that Miranda warnings were required because Cauthen was in custody, even Cauthen acknowledges that derivative evidence from an unwarned statement is not "fruit of the poisonous tree" if the statement was voluntary.[5] United States v. Sterling, 283 F.3d 216, 219 (4th Cir. 2002); see United States v. Patane, 542 U.S. 630 (2004). The Government bears the burden of proving the voluntariness of

---

[4] Cauthen also argues that if the seizure was invalid, any statements made at the police station should be suppressed because they were the necessary result of an improper search and seizure. Because the court finds that the seizure was within the parameters of the inventory search exception to the Fourth Amendment, this argument need not be addressed.

[5] The court need not address the Government's alternative argument that the questioning was not unconstitutional because it was not designed to elicit an incriminating response but rather sought to determine solely whether the moped needed to be towed.

5

Cauthen's statement by a preponderance of the evidence. Lego v. Twomey, 404 U.S. 477 (1972); United States v. Braxton, 112 F.3d 777, 780 (4th Cir. 1997) (en banc). Cauthen does not contend that his statement of ownership of the moped was involuntary.

The critical inquiry is whether the accused's will was "overborne" or his "capacity for self-determination critically impaired." Schneckloth v. Bustamonte, 412 U.S. 218, 225 (1973). "[C]oercive police activity" is a necessary predicate to the finding that a statement is not voluntary within the meaning of the Due Process Clause. Colorado v. Connelly, 479 U.S. 157, 167 (1986). However, "voluntariness is not . . . to be equated with the absolute absence of intimidation, for under this test virtually no statement would be voluntary." United States v. Pelton, 835 F.2d 1067, 1071 (4th Cir. 1987) (internal citation and quotation marks omitted). Whether a statement is voluntary is determined from the "totality of the circumstances," including the "characteristics of the defendant, the setting of the interview, and the details of the interrogation." Id.

The encounter in this case took place in a parking lot of the motel at a time when Cauthen, an adult, and his friends were awake. There is no evidence of any threat or promise to induce the statement, nor is there evidence that the encounter was prolonged. In fact, there seems to have been no "interrogation" session as such, but rather a question about ownership of the

moped.  Approximately four officers and two detectives were called to the scene – not an overbearing presence, and there is no evidence any drew their weapon or coerced the statement. Cauthen also cooperated in the investigation, which serves to mitigate any finding of coercion.  Based on all the circumstances, the court finds that Cauthen's statement as to ownership of the moped was voluntary.  Thus, the fact that it was unwarned does not serve as a basis for suppressing the resulting items seized from the search of Cauthen's moped.

**B.  Suppression of Items Seized from in the Moped**

Cauthen next moves to suppress the fruits of the search of his moped on the ground that the vehicle was seized in violation of the Fourth Amendment.  He argues that the seizure lacked probable cause,[6] failed to comply with Policy 411, and is sought to be excused under a thinly-veiled guise of an inventory search.  The Government contends the impoundment and search was a lawful inventory search.  Because a warrantless search is presumed to be unreasonable, the Government bears the burden of demonstrating, by a preponderance of the evidence, that the search was lawful under the Fourth Amendment.  Coolidge v. New Hampshire, 403 U.S. 443 (1971).

---

[6] The Government does not argue whether Cauthen's drug possession and immediate arrest provided probable cause to search his moped, relying instead on the inventory search exception.  The court therefore need not address the issue.

"The Fourth Amendment generally requires police to secure a warrant before conducting any search." United States v. Banks, 482 F.3d 733, 738 (4th Cir. 2007). Inventory searches constitute a well-established exception to the warrant requirement. Illinois v. Lafayette, 462 U.S. 640, 643 (1983). "A proper inventory search is merely an incidental administrative step following arrest and preceding incarceration, conducted to protect the arrestee from theft of his possessions, to protect the police from false accusations of theft, and to remove dangerous items from the arrestee prior to his jailing." United States v. Murphy, 552 F.3d 405, 412 (4th Cir. 2009) (quoting Banks, 482 F.3d at 739). The vehicle must be in the lawful custody of the police at the time of the search, United States v. Brown, 787 F.2d 929, 932 (4th Cir. 1986), and the inventory search must be conducted pursuant to standard criteria, such as a uniform police policy, Colorado v. Bertine, 479 U.S. 367, 374 n.6 (1987). For a policy to be valid, "it must curtail the discretion of the searching officer so as to prevent searches from becoming a 'ruse for a general rummaging in order to discover incriminating evidence.'" Banks, 482 F.3d at 739. The purpose of the search must be to secure the vehicle or its contents "and not to gather incriminating evidence against the owner." Brown, 787 F.2d at 932. Finally,

officers must administer standardized search procedures in good faith. Bertine, 479 U.S. at 374.

Here, Cauthen focuses his attack on the propriety of the seizure – the impoundment of the moped – and not the inventory that was conducted thereafter. Cauthen contends that the Salisbury Police Department lacked any basis under law or its Policy 411 for impounding the moped.

It is undisputed that Salisbury Police Department officers decided to impound Cauthen's moped after he was arrested and taken into custody. The officers impounded the vehicle, they testified, incident to Cauthen's arrest and in order to protect it. The Fourth Circuit has held that it is a proper ground to impound a vehicle for the purpose of protecting it after arresting the driver away from his home where he has no means immediately at hand for the vehicle's safekeeping. United States v. Cabbler, 528 F.2d 1142, 1146 (4th Cir. 1975) (permitting impoundment of vehicle left in hospital emergency room driveway after defendant entered hospital, where he was arrested). Such an initial impoundment is "reasonable as a sound police practice to protect both the owner from loss and the city from damage claims." Id. at 1147. As in Cabbler, the fact that Cauthen was not operating the vehicle at the time of his arrest does not vitiate the police concerns here. He clearly had been a recent occupant, was away from home, and had

9

no apparent immediate means for taking custody of it. Because Cauthen had been taken into custody and removed from the scene (with the likely prospect of not being released immediately), the more mobile, transportable nature of his moped, as compared to that of an automobile, underscored the danger to its being stolen or vandalized and makes the case for impoundment more compelling.[7]

Cauthen urges the court to follow the holding in United States v. Duguay, 93 F.3d 346 (7th Cir. 1996). There, the Seventh Circuit invalidated an impoundment of an automobile, stating that "[a]n impoundment must either be supported by probable cause, or be consistent with the police role as 'caretaker' of the streets and completely unrelated to an ongoing criminal investigation." Id. (citing South Dakota v. Opperman, 428 U.S. 364 (1976)). The court stated that the community caretaking function does not establish *a priori* the legitimacy of a search. Duguay, 93 F.3d at 352. Indeed, because the state owed no legal duty to protect things outside its custody and thus would incur no tort liability by failing to impound, the court concluded, impounding and towing would only *increase* its risks. Id. at 353. Thus, Cauthen argues,

---

[7] While local ordinances treat a moped rider as an operator of a "vehicle" for purposes of compliance with traffic laws, Salisbury Mun. Code § 13-6., a moped is not a "motor vehicle" under North Carolina law, see supra n.1, and no license is required to operate one on the roadways. N.C. Gen. Stat. §§ 20-7(a1) & 105-164.3(22). In this regard, it is more like a bicycle and akin to a personal effect.

10

impoundment based on an arrestee's status as owner or driver is irrational and inconsistent with the community caretaking function.

Cauthen's reliance on Duguay is misplaced. Duguay was a passenger in a car driven by his girlfriend, Gloria Vaughan ("Vaughan"). Under the watchful eye of federal agents, the car turned into a parking lot 50 feet short of a roadblock. Both Duguay and Vaughan exited and locked the car, and they walked toward Vaughan's apartment in a federal housing complex. The federal agents, having associated the vehicle with Duguay, who was a suspected cocaine distributor, stopped him for questioning. Duguay resisted and struck an agent, which resulted in his immediate arrest. Agents demanded the car keys from Vaughan. When she refused, agents reached into her pockets for the keys, opened the car, and "inventoried" its contents, revealing substantial quantities of crack cocaine.

The Seventh Circuit invalidated the impoundment and search for several reasons that distinguish the case. First, despite the passage of six years since the U.S. Supreme Court's pronouncement in Florida v. Wells, 495 U.S. 1 (1990), that inventory searches require standardized criteria or an established routine, the local police never developed any to regulate its inventory searches. Here, by contrast, the Salisbury Police Department has a specific, standardized policy.

11

Second, the police in Duguay never articulated a constitutionally-legitimate rationale for impounding Duguay's vehicle. Importantly, the police testified that they *always* impounded an arrestee's vehicle, regardless of whether someone else at the scene could take custody of it. Duguay, 93 F.3d at 353. As the Seventh Circuit noted, officers clearly knew that Vaughan was present, possessed the keys, and had just driven the car. Thus, she, or Duguay's brother, who also was present, could have driven the vehicle. In the present case, no one else was at the scene, and Policy 411 specifically directs an arresting officer to tow a vehicle in the control of an arrestee only if neither the lawful owner nor responsible third party is present to take custody of it. (Government Ex. 1 § V(A)(6).) Finally, Duguay clarified that an impoundment is valid, even in the absence of probable cause, "if the arrestee is otherwise unable to provide for the speedy and efficient removal of the car from public thoroughfares or parking lots." Id. at 353. This is precisely the situation the Salisbury Police Department faced, albeit on motel property.

Cauthen argues that, because the moped was parked on the motel's private parking lot, police had no need or basis under Policy 411 or their "community care-taking" function to impound it. He also argues that the Salisbury Police Department failed to demonstrate impoundment was necessary because officers failed

12

to inquire whether he could make arrangements to have the moped picked up by a friend or family member. The Fourth Circuit has clearly rejected such arguments.

In Brown, supra, the defendant argued that police failed to obtain lawful custody of his vehicle, which he parked on a private lot adjacent to apartments and a business after being stopped for suspected drunk driving. Brown argued that his vehicle was on private property and friends or relatives could have taken custody of it. The Fourth Circuit clarified that the question was "not whether there was a need for the police to impound Brown's vehicle but, rather, whether the police officer's decision to impound was reasonable under the circumstances." Brown, 787 F.2d at 932 (citing Opperman, 428 U.S. at 372-73, and Cabbler, 528 F.2d at 1145-46). That the vehicle was parked in a private lot did not undermine the officers' decision, as the court found that officers could reasonably have concluded that it "could have presented a nuisance should it have remained parked where it was until the next day or longer." 787 F.2d at 932; accord Cabbler, 528 F.2d at 1145-46 (finding that police may impound vehicle at hospital when the driver is arrested away from home to protect it or to remove a nuisance).[8]

---

[8] Notably, the dissent in Duguay observed that the Fourth Circuit, along with the First, Fifth, Eighth and Tenth Circuits (and an earlier

Moreover, police do not have an undefined duty to investigate whether third parties not present on the scene might be able to take custody of property. Brown, 787 F.2d at 932 (finding that officers' failure to inquire about, and leave the vehicle with, the defendant's girlfriend who lived nearby did not render the impoundment unreasonable, especially in the absence of any evidence that the defendant requested it); accord Bertine, 479 U.S. at 374 (noting that "[r]easonableness" of police action "does not necessarily or invariably turn on the

---

panel of the Seventh Circuit), "have determined that the police may lawfully impound automobiles when doing so accords with established procedures and is necessary either to remove the automobile from a public way or to protect the automobile or its contents from theft or vandalism." 93 F.3d at 355 (citing Cabbler) (emphases added). To the extent the Duguay panel opinion varies from this determination, it conflicts with Fourth Circuit precedent. Accord United States v. Kanatzar, 370 F.3d 810, 813 (8th Cir. 2004) (expressly rejecting Duguay in considering the likelihood of theft or vandalism when determining the reasonableness of an impoundment) (citing cases), vacated and remanded on other grounds, 543 U.S. 1107 (2005), opinion reinstated by 139 F. App'x 760 (8th Cir. 2005); United States v. Jensen, 425 F.3d 698, 706 (9th Cir. 2005) (holding that "[o]nce the arrest was made, the [community caretaker] doctrine allowed law enforcement officers to seize and remove any vehicle which may impede traffic, threaten public safety, or be subject to vandalism"). Further, it is not controlling that Policy 411 does not contain this precise theft or vandalism expression of the community caretaking function in its "Policy Statement" or "Commentary." Cf. Banks, 482 F.3d at 740 (noting that a police inventory policy need not set forth precise procedures in writing to be valid). Policy 411 on its face sets forth a non-exhaustive list of reasons for impoundment, (Government Ex. 1 §§ I, II) ("At times it becomes necessary to tow and/or impound vehicles. Reasons for such actions may include . . . vehicles which must be moved due to the operator being in police custody . . . . It is the intention of this Department, when towing vehicles, to do so in a way so that the property owner's rights are not violated and the property can be secured"), and Officers Miller and Brown clearly articulated a consistent reason for the decision to impound Cauthen's moped based on the standard set forth in section V(A)(6).

existence of alternative 'less intrusive' means") (quoting Lafayette, 462 U.S. at 647). Here, there is no evidence that Cauthen requested officers to call anyone else, nor was any evidence presented that he had a friend or relative who was available to take custody of his moped.

Finally, Cauthen argues that the Salisbury Police officers failed to follow their own policy which, he contends, bars the impoundment of vehicles on private property. It is true that section V(G) provides:

    G.   Towing From Private Property

    1.   The leaving of a vehicle on private property by persons other than the property owner or lessee often constitutes a civil matter. In these cases, the complainant should be advised that officers are not authorized to order vehicles removed.

    2.   In those instances wherein the officer cannot order the vehicle removed, the complainant is to be advised that such removal must be ordered by the complainant. Officers are to stand by to prevent any potential breach of the peace or similar offense.

    3.   Vehicles parked on another person's property may be removed at the order of an officer, providing that:

        a.   the vehicle has been left on the property for a period exceeding twenty-four (24) hours; and

        b.   The owner, lessee, or occupant of the premises submits a written request to the Police Department that the vehicle be removed; and

15

c.   The owner signs a waiver indemnifying the
                City against loss, expense, or liability
                incurred as a result of removal (Affidavit
                for Removal of Vehicle form).

      4.   Complaints of abandoned or junked vehicles on an
           individual's own property do not constitute,
           under state law, a violation for which police are
           empowered to remove vehicles. Complaints of this
           nature are to be referred to the City Zoning
           Administration for action under zoning
           ordinances.

This section contemplates the towing of vehicles abandoned on private property but not as a result of an arrest of the occupant. Impoundment of abandoned vehicles is specifically addressed elsewhere in Policy 411 and is bound by certain restrictions. (Government Ex. 1, §§ III(A), V(D).). The motel manager did not call the police to report an abandoned vehicle. Rather, the manager reported a disturbance that led to three arrests, including that of Cauthen. The court finds that this provision does not negate section V(A)(6), which the Salisbury Police Department officers used in order to determine whether to impound and inventory Cauthen's moped.

In summary, the court finds that, under the specific facts of this case, the decision of the Salisbury Police Department to impound Cauthen's moped was reasonable and made in good faith. There is no evidence that it was the product of any ruse to rummage through the vehicle for evidence. Indeed, the fact that Officer Schmeltzer did not conduct the inventory until "right
16

before" the tow truck arrived is evidence that he simply followed Policy 411, which the court finds sets forth sufficiently standardized criteria, and did not engage in an effort to conduct an illegal search.

**III. CONCLUSION**

The court has carefully considered Cauthen's arguments in support of his motion to suppress. For the reasons set forth above,

IT IS ORDERED that Cauthen's motion to suppress (Doc. 10) is DENIED.

　/s/　　Thomas D. Schroeder
United States District Judge

November 10, 2009

17

Case 1:09-cr-00218-TDS   Document 19   Filed 11/10/09   Page 17 of 17